UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| ESTATE OF JAMES ILER, by ) | |
| JOSEPH JONES, Administrator, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 22-cv-3042-DJQ |
| ) | |
| MACOUPIN COUNTY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## **OPINION**

Before the Court is Defendants Village of Brighton and Marvin Brown's, (hereinafter "Village of Brighton Defendants"), Motion for Summary Judgment, (Doc. 73) and Defendants Asa Bentley, Roger Diveley, Shawn Kahl (in both his individual and official capacity as Macoupin County Sheriff), Jacob Morgan, and Macoupin County's, (hereinafter "Macoupin County Defendants"), Motion for Summary Judgment. (Doc. 78).

For the reasons that follow, both the Village of Brighton Defendants' Motion for Summary Judgment, (Doc. 73), and the Macoupin County Defendants' Motion for Summary Judgment, (Doc. 78), are  GRANTED in part and DENIED in part.

I.     PROCEDURAL BACKGROUND

On April 1, 2021, Macoupin County Deputy Sheriff Roger Diveley shot and killed James Iler after Deputy Diveley and other law enforcement officers responded to Iler's apartment following Iler calling a non-emergency police line and indicating the police should come to his location and bring a "tank and the armaments available." Iler's Estate

brings the action. Defendants Macoupin County Deputy Sheriffs Roger Diveley, Jacob
Morgan, and Asa Bentley all responded to the scene. Defendant Macoupin County Sheriff
Shawn Kahl is sued in both his individual and official capacities. It is disputed whether
he was on the scene at the time of the shooting. Defendant Village of Brighton, Illinois
Police Officer Marvin Brown took the initial call from Iler and also responded to the scene.
The Estate brings a claim against the Village of Brighton pursuant to *respondeat superior*.

Non-parties also witnessed the incident. Carol Reese was Iler's landlord and lived
in the same apartment complex. Deborah Bott was Iler's next door neighbor. Ronald
Booth was also Iler's neighbor and lived across the street. Leslie Jones lived with Iler and
was the mother of his children but was not at home at the time of the incident. She,
however, did participate via phone during the incident. The Illinois State Police
investigated the officer involved shooting.

On April 18, 2024, the Estate filed the operative Second Amended Complaint.
(Doc. 53). Count I is a 42 U.S.C. § 1983 Fourth Amendment excessive force claim against
Deputy Diveley. Count II is a 42 U.S.C. § 1983 Fourth Amendment and *Monell* excessive
force claim against Sheriff Kahl in his official capacity. Count III is a 42 U.S.C. § 1983
Fourth Amendment conspiracy to deprive constitutional rights claim against Sheriff Kahl
in his individual capacity, and against Deputy Diveley, Deputy Bentley, Deputy Morgan,
and Officer Brown. Count IV is an Illinois state law wrongful death act claim against
Deputy Diveley. Count V is an Illinois state law willful and wanton negligence claim
against Deputy Diveley. Count VI is an Illinois state law battery claim against Deputy
Diveley. Count VII is an Illinois state law civil conspiracy claim against Sheriff Kahl, in

his individual capacity, and against Deputy Dively, Deputy Bentley, Deputy Morgan, Officer Brown, and Unknown Individuals.[1] Count VIII is an Illinois state law *respondeat superior* claim against Sheriff Kahl in his Official Capacity. Count IX is an Illinois state law *respondeat superior* claim against the Village of Brighton. Count X is a Fourth Amendment restriction of movement claim against Sheriff Kahl, in his individual capacity, and against Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown. Count XI is a Fourth Amendment failure to intervene claim against Sheriff Kahl, in his individual capacity, and against Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown. Macoupin County is a Defendant for purposes of indemnification.

## II.    FACTUAL BACKGROUND

### A.  Preliminary Events

On April 1, 2021, at approximately 7:00 p.m., Iler called the Village of Brighton police department's non-emergency phone number and spoke with Officer Brown. (Doc. 80, p. 11). At the time, Brown was the only officer on duty in Brighton. Iler gave Officer Brown his address and told him to bring "a tank and the armaments available" and that he was "ready." (Doc. 80, p. 2). During the call, Officer Brown tried but was unable to get more information from Iler. After Iler hung up, Officer Brown called back but Iler did not answer. Officer Brown then called a Macoupin County dispatcher to communicate the situation, noting that Iler sounded intoxicated. (Doc. 84, p. 3).[2] The dispatcher referred to Iler as a "drughead." (Doc. 80, p. 2). Officer Brown says he understood the term

---

[1] No other Defendants were ever served.
[2] Iler's blood alcohol level was later determined to be 0.204. (Doc. 78, p. 20; Doc. 81, p. 2).

"drughead" to mean someone "with a history of overdose and drug interactions." (Doc. 73-2, p. 25). Macoupin County Sheriff's Deputies Diveley and Morgan then drove to the Village of Brighton Police Station at approximately 7:29 p.m. to meet with Officer Brown. (Doc. 80, p. 11). The three spent approximately fifteen minutes at the Village of Brighton Police Station discussing the situation before proceeding to Iler's apartment, which was less than a mile from the station. (Doc. 80, p. 11; Doc. 84, p. 4).

### B. Pre-Shooting Events

When the Deputies and Officer Brown arrived on scene, they did not activate their emergency lights or sirens. Officer Brown parked south of Iler's residence along the side of the street. Iler's apartment was directly in front of the squad car, meaning that the squad car's camera was also facing Iler's apartment. (Doc. 80-11, p. 113). There is no dispute that Officer Brown's camera recorded footage that night. However, it is disputed exactly when Officer Brown activated his camera and whether the video was subsequently altered. Officer Brown claims he activated his emergency lights and by extension his camera immediately after the shooting. (Doc. 80-11, p. 199). Officer Brown's car remained where it was initially parked until after the shooting, when Officer Brown moved it to block traffic.

Deputy Diveley initially parked his car directly behind Officer Brown's car. Deputy Dively never activated his car camera. Deputy Morgan parked his car at the intersection of North and Olive streets and his car did not have a video camera. (Doc. 80-11, pp. 121–22). None of the law enforcement officers had body worn cameras.

4

After arriving, Officer Brown and Deputy Diveley approached Iler's apartment on foot. As they did, Officer Brown claims to have heard "a male voice from inside the apartment claim[ing] to have a pistol." (Doc. 73–1, p. 3). In his report, Deputy Dively does not mention that he heard the alleged statement but does say, "Deputy Morgan said that Leslie [Jones] informed the landlord [Reese] that Iler made the comment that he had acquired a gun today." (Doc. 78-1, p. 444). In his deposition, Deputy Dively testified he did not know whether Iler had a gun. (Doc. 78-1, p. 368).

The Estate disputes that Iler claimed to have a gun. According to the Estate, Iler was upset and did not want to interact with police. (Doc. 80, p. 2). The Estate's also maintains that other eyewitnesses specifically deny that Iler admitted to having a gun. Namely, Reese testified she told Deputy Morgan that Iler did not have a firearm. (Doc. 80, p. 2). Bott, a neighbor, testified that she heard Iler ask to talk to his girlfriend, Jones, but heard no reference to a gun. (Doc. 80, p. 2). When asked if Iler told her he had a gun that day, Jones testified "[n]ot that I recall." (Doc. 80-9, p. 28). When asked if she told officers that Iler had told her he had a gun, Jones responded "I don't recall that." (Doc. 80-9, p. 28).

Deputy Morgan testified in his deposition that Iler was "upset" and saying things "of a nature without specific words being known to me." (Doc. 78–3, p. 24). Deputy Morgan said he spoke to Reese, Iler's landlord, to ascertain the layout of Iler's apartment to be able to cover all entrances and potential exits. (Doc. 78-3, p. 107). Deputy Morgan testified that during this conversation, he learned of an allegation of Iler's "suicidal tendency." (Doc. 78-3, p. 142). Deputy Morgan claims that when he spoke to Reese, Reese

5

said that she had heard Iler express an interest in obtaining a firearm, but not that he had one currently. (Doc. 78-3, p. 114).

      C.  The Shooting

Whether or not he claimed to have a firearm, it is undisputed that when Officer Brown and Deputy Diveley first approached the apartment, Iler did not make any threats to law enforcement or to himself. (Doc. 82, p. 2). It is also undisputed that Iler initially stayed in the apartment. After first approaching the apartment, Officer Brown and Deputy Diveley backed up and began yelling at Iler to come out. Deputy Diveley next moved his squad car so that the front of the car was pointing towards the front of Iler's apartment. (Doc. 78–3, p. 119). The squad car was "no further than 30 feet" from Iler's porch. (Doc. 78-1, p. 15). At this point, both Deputy Diveley and Officer Brown's cars were facing Iler's apartment. Deputy Morgan testified that they repositioned their squad cars and shined spotlights on Iler's apartment. (Doc. 78-3, pp. 33; 105). In effect, the police created a perimeter around Iler's apartment and blocked all exits from Iler's apartment. (Doc. 78–3, p. 112).

Thereafter, Deputy Bentley arrived on the scene. It is disputed what happened next. Officer Brown claims five to ten minutes after their initial closed-door encounter, Iler opened the door and came outside with two swords "approximately 20 inches in length." (Doc. 73–1, p. 3). Conversely, the Estate claims that Iler opened the door and stood in his doorway but that he never went outside. (Doc. 80, p. 3). It is undisputed that Iler was banging the knives or swords together and was "swinging them around." (Doc. 80, p. 3). At some point, Iler shut the door and either reentered or stayed in the apartment.

Deputy Bentley also wrote that Iler "would frequently yell while inside the residence. I could hear banging on the window and door." (Doc. 78-1, p. 202). This was the first of at least three occasions that Iler opened his door and interacted with law enforcement.

Shortly thereafter, Officer Brown, at Deputy Diveley's suggestion, contacted the Macoupin County State's Attorney and recounted all that had taken place. (Doc. 80, p. 14). The State's Attorney advised that no exigent circumstance existed that would permit the Officers to forcibly enter Iler's apartment. (Doc. 80, p. 4). Deputy Diveley also spoke to a Macoupin County Sheriff's Office employee to see if a SWAT team was available. Deputy Diveley was informed that the incident did not meet SWAT deployment criteria. (Doc. 78, p. 10). Around this time, Sheriff Kahl texted Deputy Diveley and asked how the situation was going. Deputy Diveley did not respond to the text.

The second time Iler opened the door to his apartment, he requested to speak with his girlfriend, Jones. (Doc. 80, p. 14). It is undisputed that this time he was armed with a knife or a sword. (Doc. 80, p. 14). Deputy Diveley wrote in his report that Iler stated, "Pull your gun out and shoot me, I just want to die." (Doc. 78-1, p. 444). Iler then went back into his apartment and closed the door. This interaction lasted less than one minute.

A short while later, Iler opened the door to the apartment for the third time, and this time it is undisputed that he exited the apartment. (Doc. 80, p. 15). After exiting, Iler picked up the railing from his porch and threw it off of the porch. (Doc. 80, p. 15). At some point prior to Iler exiting the apartment, Deputies had contacted Jones by cell phone and put the phone on the hood of Deputy Diveley's car. They instructed Iler to come to the phone and speak to Jones. (Doc. 80, p. 16). It is disputed whether Iler was armed at

7

this point. The law enforcement officers claim Iler possessed both knives on the porch. The Estate disputes that the second knife was on the porch. Either way, Iler was sitting or standing on his porch for less than two minutes. (Doc. 73-2, p. 47). Iler, as instructed, then walked down the steps of the porch towards the phone and the Deputies. (Doc. 80, p. 17). The record is unclear, and it is disputed, exactly where the Deputies and Officer Brown were standing in relation to the phone.

At approximately 8:25 p.m., Deputy Diveley shot and killed Iler. Officer Brown never drew his weapon. (Doc. 80–11, p. 190). Deputy Bentley's weapon was drawn and pointed at Iler. (Doc. 78–1, p. 16). Just before Deputy Diveley shot Iler, it is disputed whether Iler was armed with a knife and how fast he was approaching or even whether he was approaching Deputy Diveley.

Deputy Diveley claims that Iler approached him with one knife in his hand and that he instructed Iler to drop the weapon. (Doc. 73–1, p. 4). Deputy Diveley claims that "after a brief pause," Iler "locked eyes with Diveley" then "pointed his sword at Diveley" and "made a furtive movement." (Doc. 84, p. 16). The Estate claims, based upon testimony from neighbors, that Iler was unarmed. (Doc. 80, p. 16). The Estate points to eyewitness testimony from Bott and Reese, who maintain Iler was unarmed and refute that police instructed Iler to lower any weapons. (Doc. 80, p. 6). Bott also testified that Iler did not make any jerking or furtive movements before being shot and was not moving. (Doc. 81, p. 35; Doc. 80, p. 17). Reese testified that Iler walked slowly down the steps with no knife in his hands. (Doc. 80, p. 17). Reese further testified that Iler was standing still

8

and had nothing in his hands when he was shot. (Doc. 80, p. 17). Booth testified that there were no warnings given before Iler was shot. (Doc. 80, p. 17).

Officer Brown testified in his deposition that Iler was walking in the direction of the cellphone when he was shot. (Doc. 80, p. 16). In his report, however, Officer Brown wrote that Iler was walking towards Deputy Diveley when he was shot. (Doc. 73-3, p. 3). Similarly, Deputies Diveley, Bentley, and Morgan all claim that Iler was walking towards Deputy Diveley. (Doc. 78-3, p. 258; Doc. 73-3, p. 3; Doc. 78-1, p. 202).

There is also a dispute as to exactly where all of the Deputies and Officer Brown were when Deputy Dively shot Iler. The Estate claims, based on witness testimony, that they were across the street or in the street but behind the trunk of a police vehicle. (Doc. 81, p. 3). Reese testified that the Deputies were across the street. (Doc. 81, p. 2). Booth testified that the Deputies were in the street and six to eight feet behind the trunk of a vehicle. (Doc. 81, p. 2). Deputy Diveley claims he was positioned to the front left of his squad car, even with the driver side tire. (Doc. 78, p. 11). According to Deputy Diveley, he estimates he was eight to ten feet away from Iler when he fired, but he admits he did not measure the distance. (Doc. 78–1, p. 378–79). Deputies Bentley and Morgan testified that they were within five feet of Deputy Diveley, while Officer Brown was further back. (Doc. 78–1, pp. 17, 31; Doc. 78-3, p. 258). It is undisputed that Iler was between his porch and the front of Deputy Diveley's car when he was shot. (Doc. 81, p. 2).

### D.  Post-Shooting Events

Immediately after the shooting, Deputies Bentley and Morgan, along with Officer Brown handcuffed and searched Iler, finding cigarettes, a pocketknife, and his wallet.

9

Deputy Morgan claims he moved these items, along with the knife Iler was allegedly holding, to the porch and placed it with a second knife that was already on the porch. (Doc. 78-3, p. 196). The Estate claims Iler did not have a knife near him when he was shot. Officer Brown testified that he ran to his squad car, turned on the overhead emergency lights—which activated the squad car's camera, and retrieved medical supplies to aid Iler. (Doc. 73-2, p. 50). Deputies provided medical attention to Iler until an ambulance arrived on the scene.

Immediately after securing Iler and the arrival of the ambulance, Deputies Bentley and Morgan, along with Officer Brown, entered Iler's home to check for other persons and for the firearm they allege Iler claimed to have had earlier. (Doc. 78-3, p. 193, Doc. 80-11, p. 202). They claim they were in the apartment for less than five minutes. (Doc. 78-3, p. 193). No gun was found. It is disputed whether a second knife was in the apartment or on the porch at the time of the search. Deputy Diveley testified in his deposition that Iler had both knives while on the porch but was holding only one when he approached him. (Doc. 78–1, p. 345–46). The Estate, conversely, points to Officer Brown's deposition testimony where he stated that "the curved bladed, I believe it was in the kitchen area." (Doc. 80-11, p. 202). Officer Brown testified that he did not move a knife from the kitchen to the porch. (Doc. 80-11, p. 202). The Estate maintains that there was no knife on the porch until the Deputies moved it from the apartment to the porch in order to "lend[] credence" to their version of the events. (Doc. 80, p. 35).

After the shooting, Illinois State Police ("ISP") investigators arrived on the scene to investigate the officer involved shooting. Before ISP arrived, Deputy Diveley told

Deputies Bentley and Morgan to separate and to not talk to anybody. (Doc. 78-1, p. 445). According to Deputy Diveley, he did not want ISP investigators arriving on scene and seeing them discussing the events that had just occurred. (Doc. 78-1, pp. 218–19). Deputies Bentley, Diveley, and Morgan, along with Officer Brown, however, admit they talked about the shooting together in the immediate aftermath. Once ISP investigators arrived, Officer Brown spoke briefly to an investigator. (Doc. 73-2, p. 52). Deputies Bentley, Diveley, and Morgan did not speak to ISP investigators at the scene. (Doc. 78-3, p. 205). An attorney from the Deputies' union came to the scene and Deputy Morgan testified that he spoke with him. (Doc. 78-3, p. 206). The Deputies then went to the Village of Brighton Police Station to give ISP investigators evidence. (Doc. 78-3, p. 210).

Deputies Bentley, Diveley and Morgan each authored reports of the events. Sheriff Kahl allowed them to wait to submit their reports, rather than have them completed before the end of their shift in accordance with office policy. (Doc. 81, p. 8). Officer Brown also authored a report. The Deputies took more than one week after the shooting to submit. Before completing the reports, Deputies Diveley, Bentley, and Morgan communicated with each other about the incident to include exchanging text messages and phone calls. Specifically, they communicated about where the knives were positioned after the shooting as well as facts surrounding the shooting. (Doc. 78-1, pp. 400, 405). Deputy Bentley sent Deputies Diveley and Morgan a rough draft of his report before all the reports were submitted. (Doc. 81, p. 7).

Deputies Diveley and Bentley also tried communicating with Officer Brown before submitting their reports. (Doc. 78-1, p. 396–97). When both were unable to reach Officer

11

Brown, Deputy Bentley offered to go "hunting" for Brown. (Doc. 78-2, p. 11). Deputy Bentley testified in his deposition that he was concerned and wanted to check on Officer Brown for his wellbeing. (Doc. 78-3, p. 211).  But in his communications with Diveley, Deputy Bentley suggested that Officer Brown was "scared" of Bentley and Deputy Diveley, to which Diveley replied "Lol.. who knows." (Doc. 78-2, p. 11). The next day, Deputy Diveley asked Deputy Bentley if he had spoken to Officer Brown yet, which Deputy Bentley replied that he had not. (Doc. 78-2, p. 12). Deputy Diveley replied "Unreal" and then said to Deputy Bentley "…if anything if [Brown] is working tonight go see him[.]" (Doc. 78-2, p. 12). Officer Brown claims that other than at the scene, he did not speak to any of the Deputies about the shooting. (Doc. 80-11, p. 205).

In their submitted reports, none of the Deputies documented their post shooting, on scene discussions. Nor did they document that, in the days after the shooting, they exchanged messages about the facts surrounding the shooting. (Doc. 81, p. 7). Deputy Morgan even deleted the text messages from his phone. (Doc. 81, p. 7; Doc. 78-3, p. 216).

It is undisputed that Sheriff Kahl was eventually on the scene. It is, however, disputed whether he was at the scene before the shooting. Sheriff Kahl, relying on his testimony and dispatch and text message evidence, claims he arrived after Deputy Diveley shot Iler. The Estate notes that an eyewitness, Reese, claims to have spoken with Sheriff Kahl at the scene before the shooting. (Doc. 81, p. 4). In her deposition, Reese specifically says that she was speaking to Sheriff Kahl and that "he had the sheriff on his shirt. So, I figured I was talking to the right person." (Doc. 78-6, pp. 8–9). When asked to clarify how she knew she was speaking to Sheriff Kahl and not someone else, Reese stated

"his picture is all over the billboards. He runs for Sheriff of Macoupin County." (Doc. 78-6, p. 34). She further stated, "he had the Sheriff patch" on his shoulders and it was "different" from the ones on the other Deputies. (Doc. 78-6, p. 35).

### E. Video Evidence

Deputy Diveley's squad car was equipped with a video camera at the time of the shooting, but Deputy Bentley and Deputy Morgan's cars were not. (Doc. 78-4, p. 24). Deputy Diveley did not activate his camera at any time because he did not turn on his overhead emergency lights before or after the shooting. (Doc. 78-1, p. 319). Officer Brown's car had a camera that activated when the emergency overhead lights were turned on. It is unclear exactly when Officer Brown activated the emergency lights.

Sergeant Dustin Ford of the Village of Brighton testified about the camera in Officer Brown's car. (Doc. 80-10, pp. 19–21). According to Sergeant Ford, every time the overhead emergency lights are activated, the camera records, and each recording is stored separately to represent the occasions that the lights were turned on. For example, if Officer Brown thrice turned on his lights in a given night, there would be three separate files on the camera SD card. (Doc. 80-10, p. 20). Sergeant Ford testified that there would be no reason for Officer Brown, or any other officer, to edit the videos.

Sergeant Ford further testified that there would be a thirty second buffer from when Officer Brown activated his lights. (Doc. 80-10, p. 51). Put differently, after the lights were activated, the previous thirty seconds are retroactively stored as a recording. According to Sergeant Ford, when Officer Brown activated his lights, the SD card should have logged and recorded the prior thirty seconds. At his deposition, Officer Brown could

not explain why, despite that buffer, there was no recording of him walking to the squad car to turn the lights on. (Doc. 73-2, p. 30).

Sergeant Ford testified that, to his knowledge, there has never been a time when a video was lost, or the SD card malfunctioned. (Doc. 80-10, p. 38). When presented with a hypothetical of whether the SD card could have been removed from the camera and the video altered without anyone knowing, Sergeant Ford agreed that the hypothetical premise was true. (Doc. 80-10, p. 52). The Estate claims that there is no explanation for the missing video. The Estate suggests that Officer Brown had both opportunity and motivation to delete the video in order to protect Deputy Diveley. Conversely, Officer Brown testified that he did not alter the video, did not know how to alter the video, was unaware of the thirty-second delay, and was instructed by Sergeant Ford after the incident to not go anywhere near the camera unit. (Doc. 73-2, pp. 70-71).

Sergeant Ford testified Officer Brown did not work April 2-4, 2021, but that he worked on April 5, 2021, and had access to the camera hard drive and SD card on April 5, 2021. (Doc. 80-10, p. 11). Sergeant Ford testified that he had no way of determining whether Officer Brown removed the SD card from the camera. (Doc. 80-10, p. 12). At the request of ISP investigators, Sergeant Ford removed and secured the hard drive and SD card from Officer Brown's vehicle on April 6, 2021, and gave it to ISP investigators. (Doc. 73-3, p. 4). When the SD card came back a month later, Sergeant Ford testified that the video had been deleted by ISP. (Doc. 80-10, p. 45).

14

### F.  Opinion Testimony

Chet Epperson, a retired law enforcement officer, is the Estate's expert. Epperson opines that the Sheriff's department failed to: (1) follow their own policies; (2) maintain and implement sufficient use of force policies; (3) recognize, collect, identify, and investigate prior serious use of force incidents; (4) assess and train on how to interact with people suffering from mental health crisis; (5) discipline officers who violated office use of force policies; (6)  hold officers responsible for use of force incidents involving training, tactical, and policy issues; and (7) conduct annual deputy performance evaluations to ensure compliance with professional policing standards and policies. (Doc. 80-6, pp. 1–38). He further opines that the department's failure to investigate claims of excessive force incidents became a *de facto* policy of non-investigation. Defendants did not retain an expert.

### III.    LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The movant bears the

15

initial responsibility of informing the court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may respond by showing the existence of an issue of material fact. *Anderson*, 477 U.S. at 255.

"On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "In applying this standard, all disputed issues of fact are to be resolved in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

IV.    ANALYSIS

A.  Count I: Fourth Amendment Excessive Force Claim Against Deputy Diveley

The Fourth Amendment states the "right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Although police officers may use force to seize another person under appropriate circumstances, the Fourth Amendment protects against the use of excessive force. *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). "The question whether a particular use of force has crossed the constitutional line is governed by the Fourth Amendment, which prohibits unreasonable seizures." *Id*. at 448 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Court analyzes excessive force cases under an objective reasonableness standard. *Graham*, 490 U.S. at 388.

The analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotations omitted). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015) (citing *Graham*, 490 U.S. at 396).

When it comes to deadly force, "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *see also Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018). In *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Supreme Court held that a police officer violated a suspect's Fourth Amendment rights when the officer shot the suspect as he tried to flee the scene. Though the officer feared that the suspect would escape arrest, the Court stated plainly that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id*.

The relevant question is whether the totality of the circumstances justifies a particular sort of seizure. *Id*. at 8–9. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other

17

'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* For excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. On par with other Fourth Amendment contexts, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In the present case, there are two very different factual versions of what happened. The Estate submits Iler was not armed with a knife when he was shot, and he was not approaching Deputy Diveley. (Doc. 80, p. 23). Although not entirely consistent with each other, multiple non-police witnesses make one or both of these assertions. (Doc. 80, p. 7).

On the other hand, Deputy Diveley, the other Deputies, and Officer Brown paint a very different picture. Deputy Diveley claims that Iler approached him with one knife in his hand and that he instructed Iler to drop the weapon. (Doc. 73-1, p. 4). Deputy Diveley claims that after a brief pause, Iler "locked eyes with Diveley" then "pointed his sword at Diveley" and "made a furtive movement." (Doc. 84, p. 16). To varying degrees, all of the other Deputies and Officer Brown agree with Deputy Diveley as to how the

18

incident occurred. Deputy Diveley also submits that the record is clear that Iler was armed and that the non-police witnesses did not have good vantage points. (Doc. 78, p. 31–32). Weighing evidence and evaluating credibility of witnesses, however, is not proper at the summary judgment stage.

Viewing all facts in the light most favorable to the Estate, the Court finds that a reasonable jury could find that Deputy Diveley violated Iler's Fourth Amendment right to be free from unreasonable seizure when he shot and killed Iler. In other words, a jury could find that Deputy Dively's use of deadly force was not objectively reasonable.

1. Qualified Immunity

As it relates to Count I, Deputy Diveley asserts that even if the Court finds there is a disputed material fact as to whether his use of deadly force was objectively reasonable, he is still entitled to qualified immunity. (Doc. 78, p. 32).

Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Qualified immunity is an affirmative defense, but once the defendant raises it, "the burden shifts to the plaintiff to defeat it." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To do so, the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

a.  Constitutional Right

Deadly force is warranted only when an immediate threat of serious harm to an officer or others is present. *Weinmann*, 787 F.3d at 448; *Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). In *Gant v. Hartman*, 924 F.3d 445 (7th Cir. 2019), the Seventh Circuit dismissed an officer's appeal of the district court's denial of summary judgment regarding qualified immunity. There, an officer shot the plaintiff, mistakenly believing he was holding a handgun. *Id.* at 447. The plaintiff argued he was attempting to surrender. *Id.* The Seventh Circuit declined appellate jurisdiction because the officer's argument relied on disputed material facts. *Id. See also White v. Gerardot*, 509 F.3d 829, 835 (7th Cir. 2007) (holding that the court lacked jurisdiction to hear an officer's interlocutory appeal because legal arguments that the officer presented on appeal were wholly dependent upon, and inseparable from, his reliance on disputed facts).

The undisputed fact that Iler was at one point armed with a knife during the occurrence does not change the analysis. If the dangerous conditions had curtailed, a reasonable officer may not conclude that in these circumstances it was lawful to use deadly force. *Smith v. Finkley*, 10 F.4th 725, 748 (7th Cir. 2021) (citing *Strand*, 910 F.3d at 915). *See Lopez v. Sheriff of Cook County*, 993 F.3d 981, 987 (7th Cir. 2021) (stating "authoriz[ation] to use deadly force at one moment . . . is not a blank check"). The Seventh Circuit has cautioned that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993). After all, "[t]he circumstances might materially

20

change," for "[e]ven though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). *See also Lytle v. Bexar County, Tex.*, 910 F.3d 909, 915 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.")

Deputy Diveley's argument for qualified immunity, and all the cases he cites, (Doc. 78, p. 33), are premised on that fact that he reasonably believed Iler was armed with a knife and approaching him when he fired. These facts, however, are disputed. *See Weinmann*, 787 F.3d at 451 (explaining that "[t]he existence of a factual dispute about the circumstances surrounding [an officer]'s decision to fire on [the plaintiff's deceased] precludes a ruling on qualified immunity at this point"); *See also Smith v. Finkley*, 10 F.4th 725, 748 (7th Cir. 2021) ("The events here preceding and during the shooting remain subject to interpretation, including the level of threat Smith posed and how actively he was resisting. These questions are important to and inseparable from the qualified immunity decision.").

In sum, material facts here remain disputed and unresolved.

### b.  The Right was Clearly Established

The clearly established prong of the qualified immunity analysis ensures that a government official is held liable only when the contours of the right allegedly violated are "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Manery v. Lee*, 124 F.4th 1073, 1080 (7th Cir. 2025)

(quoting *Plumhoff v. Rickard,* 572 U.S. 765, 778–79 (2014)). A plaintiff can meet this burden in an excessive force claim by showing "that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Manery*, 124 F.4th at 1080 (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)).

The right to be free from excessive force has been clearly established for a long time. *Tennessee v. Garner*, 471 U.S. at 9 ("The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment."). It was clear to officers on April 1, 2021, that shooting an unarmed person who posed a diminishing threat violated the Fourth Amendment. *Weinmann*, 787 F.3d at 448; *Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Conversely, shooting a person an officer reasonably believed was armed and who presented an immediate threat to the officer did not violate the Fourth Amendment.

Like the first prong of qualified immunity, the Court finds that facts need to be determined before the question can be answered. *See Strand*, 910 F.3d at 918 (the "existence of a substantial factual dispute about the circumstances and timing surrounding [the officer's] decision to shoot [the plaintiff] precludes a ruling on [both prongs of] qualified immunity at this point.").

Accordingly, Deputy Diveley is not entitled to summary judgment on Count I and the Court reserves ruling on qualified immunity until factual questions are resolved.

B.  Count II: Fourth Amendment Excessive Force *Monell* Claim Against
    Sheriff Kahl in his Official Capacity

The Estate argues that the *Monell* claim should proceed to trial because the Macoupin County Sheriff's Office did not properly train the involved deputies, did not evaluate the deputies, did not follow its own policies, had deficient policies, employed unconstitutional customs and practices, and did not investigate prior use of force claims. (Doc. 81, p. 21). The Court notes that while the Estate claims there were unconstitutional customs and practices, it does not develop the argument, nor does it direct the Court to precisely which policies or customs it claims are unconstitutional.

A plaintiff challenging a facially lawful policy (express or implied) "generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985). Typically, failure to train claims are no different. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379–80 (7th Cir. 2020) (a *Monell* failure to train theory requires showing the municipality had notice that gaps in its training would cause constitutional violations, and in many cases, notice is shown with "proof of a prior pattern of similar constitutional violations.").

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989), the Supreme Court clarified that inadequate police training may serve as a basis for § 1983 liability only if

the failure to train amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. *Id*. at 388. In order to prevail at this stage, the Estate must demonstrate that under the "deliberate indifference" standard of *Canton,* there is sufficient evidence to support a jury verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

There is also a heightened evidentiary burden to ensure there is a "true municipal policy at issue, not a random event." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022) (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). There is a narrow exception to the requirement of evidence of prior violations for the "rare" case in which "the unconstitutional consequences" of municipal inaction are "so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).

Additionally, there is a causation requirement. The "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *Dean v. Wexford Health Sources Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting *Board of County Com'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997).

### 1. Mental Health

The Estate advances an argument that had the Deputies been properly trained on how to interact with people experiencing mental health episodes, the incident would not have occurred. (Doc. 81, p. 21). The Estate asserts that a reasonable jury could conclude that had they been properly trained, the officers "would have contacted" a mental health

24

care facility, which could have prevented Iler's death. (Doc. 81, p. 21). The Estate relies on its expert and argues that the Deputies did not receive enough training on how to deal with recurring mental health situations, such as Iler's. (Doc. 81, p. 22). The Estate argues that the failure to train led to the foreseeable consequence of Iler's death.

The Estate, however, cites to no other recurring situations with other individuals or provides details of prior interactions with Iler that would show deliberate indifference. Case law requires that the need for training must be is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers can reasonably be said to have been deliberately indifferent to the need. *Canton*, 489 U.S. at 390. The Estate fails to set forth facts that a reasonable jury could so find.

This case also does not fall under the "narrow range of circumstances" to which the possibility of harm from the custom is so obvious that evidence of a series of prior injuries is not needed. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). The Estate simply does not present facts of prior incidents that would put the Sheriff on notice that a failure to conduct mental health training, beyond what the Deputies received in academies, rose to the level of deliberate indifference or that the lack of training or policies caused Deputy Diveley to shoot Iler. Again, there is a rigorous causation standard. *Board of County Com'rs of Bryan County, Okla.*, 520 U.S at 404. *See City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

2.  Use of Force

The Estate also argues that the Macoupin County Sheriff's Office policies and practices, to include training on use of force, rose to the level of deliberate indifference and caused Iler's death. (Doc. 81, p. 21).

The Estate argues that the failure to train deputies on department policies relating to use of force coupled with the lack of regular evaluations led to the foreseeable consequence of Iler's death. The Estate submits that there was a policy in place for the Sheriff's Department to investigate use of force incidents, but that it was ignored by the Sheriff. The Estate's expert, Epperson, testified that in the preceding five years before Iler was shot, there were nineteen instances of force in the Sheriff's Office where someone was injured, and that none of them were investigated. (Doc. 81, p. 23). Epperson opined that by not investigating, it became a policy of non-investigation. (Doc. 81, p. 13). The Estate also points to prior instances of force by Deputy Diveley, and the verbal complaints allegedly made against him that went both uninvestigated and unpunished. (Doc. 81, p. 23). According to the Estate, no Deputy was investigated or disciplined for excessive use of force in the ten years preceding the events in question, leading to a "do what you want" attitude. (Doc. 81, p. 23).

The Estate further argues that via these practices, the Sheriff's Department is "deliberately blinding" itself to facts, creating a custom of "turning a blind eye to deputies' use of force, which thereby encourages and implicitly promotes any type of force" used by the deputies. (Doc. 81, p. 23). The Estate argues that "there is a straight line between turning a willful blind eye to potential unconstitutional behavior by not

investigating deputy uses of force, and [Iler] getting shot by Diveley." (Doc. 81, p. 24). The Estate notes that there were no internal investigations of uses of force and claims that by not investigating uses of force, a clear message is sent: "do what you want to do because there aren't any consequences to your actions." (Doc. 81, p. 24).

In response, Sheriff Kahl argues that the Estate fails to demonstrate how any of the allegations constitute "deliberate indifference" or caused the alleged constitutional violation. (Doc. 84, p. 17). Sheriff Kahl maintains that the Estate has failed to point to any patterns of evidence of similar alleged constitutional violations. (Doc. 84, p. 17). Sheriff Kahl also asserts that aside from citing expert testimony, that the Estate cites only one case and fails to present evidence to create a triable issue of fact as to deliberate indifference or causation. (Doc. 84, p. 18).

Sheriff Kahl further argues that the Deputies received initial and ongoing law enforcement training. (Doc. 78, p. 36). Deputies Diveley, Bentley, and Morgan all completed required initial training at police academies and completed continuing education as required by Illinois law. (Doc. 78, p. 36). Sheriff Kahl maintains that since he has been Sheriff, there has only been one prior shooting that occurred in 2015 that, although it was not investigated internally, it was investigated by Illinois State Police. (Doc. 78, p. 37).

The recent case, *Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022), is illustrative. In *Taylor*, the plaintiff alleged one constitutional violation. *Id*. at 437. The court held that this was not enough to rise to the level of deliberate indifference to an implied policy of inaction because if there was a "widespread practice" of constitutionally violative

27

behavior, then the Court "would have expected discovery . . . to turn up evidence to that effect—internal documents, citizen complaints or calls for an investigation, or perhaps some form of inquiry by an inspector general." *Id*. Despite the constitutional violation being "a very unfortunate" event, the Court concluded that the plaintiff did not meet his burden to satisfy *Monell* liability. *Id*.

The Estate argues that the Sheriff essentially stuck his head in the sand to prevent evidence from becoming available. But that is speculation. The 2015 shooting was investigated by the Illinois State Police, and there is insufficient evidence to show that Deputy Dively had a history of employing excessive force. In support, the Estate cites to an affidavit from Charlie Stainback, who alleges that Deputy Diveley subjected him to excessive force in November of 2020, while Stainback was suffering a mental health crisis. (Doc. 81-12, p. 1). Stainback claims that he complained to Sheriff Kahl and that "no investigation occurred to the best of [Stainback's] knowledge." (Doc. 81-12, p. 1).

The Estate points to Stainback as evidence contrary to the Sheriff's assertion that there were no written complaints received in the five years preceding the shooting. (Doc. 81, p. 7). In response, Sheriff Kahl argues that Stainback's allegation is "woefully conclusory and consists of inadmissible hearsay." (Doc. 84, p. 20). The Court takes judicial notice of the fact Stainback filed a civil lawsuit about his assertion, 22-cv-3245, that was ultimately dismissed with prejudice for failure to prosecute. (*See* 3:22-cv-3245, Doc. 32).

Even if the Court assumes Stainback's assertions are true and qualify as either non hearsay or an exception to hearsay, two alleged isolated incidents over a five-year span is insufficient to advance the *Monell* claim to a jury. *See Grieveson v. Anderson*, 538 F.3d

763, 774 (7th Cir. 2008) ("[W]hat is needed is evidence that there is a true municipal [or corporate] policy at issue, not a random event."); *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference"); *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993) (requiring "a pattern or a series of incidents of unconstitutional conduct").

The question is not whether the Macoupin County Sheriff's Department used best police practices. Rather, it is whether its policies and practices amounted to deliberate indifference and caused Iler's death. *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 675–76 (7th Cir. 2022) (This is a "rigorous causation standard" that requires the plaintiff to "show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights."). No reasonable jury could find deliberate indifference or a direct causal link.

Accordingly, summary judgment is granted in favor of Sheriff Kahl on Count II.

### C. Count X: Fourth Amendment Restriction of Movement Claim Against Sheriff Kahl, Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown

Because it helps resolve various other Counts, the Court will next address Count X. The Estate claims that Defendants unreasonably seized Iler in violation of the Fourth Amendment when they set up a perimeter and later admitted he was not free to leave. (Doc. 80, pp. 20, 22). Count X is against Sheriff Kahl, in his individual capacity, Deputies Diveley, Bentley, and Morgan, and Officer Brown. At issue is whether Iler was subject to an unreasonable seizure in violation of the Fourt Amendment prior to him being shot.

1.  Seizure

A two-part test is used to decide whether a person has been seized, thus triggering Fourth Amendment protections. First, is whether physical force was used along with a show of authority, and second, whether or not the person submitted to the show of authority. *California v. Hodari D.*, 499 U.S. 621, 624–26 (1991). There must be "an intentional acquisition of physical control," *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989), with the state actor "restrain[ing] the freedom of a person to walk away, [thereby] seiz[ing] that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (citation omitted). A court considers the totality of the circumstances to determine "whether a reasonable person would feel free to terminate the encounter." *United States v. Lopez*, 907 F.3d 472, 487 (7th Cir. 2018).

Consensual encounters are not seizures. *See United States v. Mendenhall*, 446 U.S. 544, 553–554 (1980) ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'") (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). Importantly, "a seizure requires not only that the reasonable person feel that he is not free to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police." *Carter v. Buscher* 973 F.2d 1328, 1333 (7th Cir. 1992) (citing *Hodari*, 499 U.S. at 626 (holding that a seizure does not occur when a subject does not yield.)).

30

The Estate argues that Iler was seized without probable cause "the moment [Iler] refused to come to his door" and "from the instant that the officers arrived on scene until he was shot and killed by Diveley." (Doc. 80, pp. 23, 26). The Estate contends that Iler "did not want to interact with police at all" but that the Officers nevertheless set up a perimeter, began yelling at Iler to come outside and later admitted he was not free to leave. (Doc. 80, pp. 21–22). The Estate next points to Iler coming out to speak with Jones over the phone after Deputy Diveley ordered him to come out, as evidence of his acquiescence to the commands, thus supporting the finding of a seizure. (Doc. 80, p. 23).

Defendants argue that the only time Iler was seized is when he was shot. (Doc. 73-1, p. 10). Alternatively, Defendants submit that even if there was seizure prior to the shooting, the seizure was reasonable because probable cause existed for them to believe Iler was a danger to himself. (Doc. 73-1, pp. 9–10; Doc. 78, p. 24). The Defendants also maintain that it is undisputed that Iler started the chain of events by calling the Village of Brighton police department, giving his address, and telling them to bring "a tank and the armaments available" and that he was "ready." (Doc. 80, p. 2). Thus, according to Defendants, it was a consensual encounter instigated by Iler.

It is a close question whether Iler was seized before he was shot. Various facts weigh in favor of determining Iler was seized. He was surrounded by police. Deputy Diveley's car was parked facing Iler's porch and Officer Brown's car was parked directly in front of where Iler was shot. (Doc. 73-2, p. 29). The police created a perimeter around his apartment, covering all exits. There were also spotlights shined at his apartment. Police shouted commands at him to come out. The Estate claims that Iler told police,

while in his house, that he did not wish to speak to them. The law enforcement officers all testified that Iler was not free to leave.

Conversely, Iler started the chain of events by calling the police and he did not attempt to leave the premises until shortly before he was shot. In other words, it could be deemed a consensual encounter because he called the police to come to his apartment.  It is also not entirely clear that he would have been seized after he spoke to Jones and that he yielded to police authority.

Ultimately, the Court does not need to decide the issue because it finds that even if Iler was seized prior to being shot, that the seizure was reasonable and even if it was not reasonable, the officers are entitled to qualified immunity.

### 2.  The Seizure Was Reasonable

Where an arrest occurs without probable cause, a plaintiff may bring a claim for unreasonable seizure. *See A.M. v. Butler,* 360 F.3d 787, 798 (7th Cir. 2004). Taking the facts in a light most favorable to the Estate, the Defendants did not have probable cause to arrest Iler. Officer Brown, on the scene, called the State's Attorney, who told them there was no exigent circumstance to enter Iler's home. (Doc. 82, p. 5). Defendants also admit that there was not an arrestable offense at the time. (Doc. 78-1, pp. 65, 133; Doc. 78-3, p. 115; Doc. 78, p. 4). The Defendants, however, maintain that they had probable cause to detain Iler for a mental health evaluation**.**

Probable cause is an objective standard. *Pryor v. Corrigan*, 124 F.4th 475, 486 (7th Cir. 2024). As the Supreme Court has explained, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal

justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Generally, "a mental-health seizure is lawful if there is probable cause to believe that the person is a danger to herself or others." *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015). The court must view all facts from the standpoint of an "objectively reasonable police officer" and determine, based on those facts, whether probable cause existed. *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018); *see also Washington v. City of Chicago*, 98 F.4th 860, 875 (7th Cir. 2024) ("Probable cause is 'assessed objectively' based on 'the conclusions that the . . . officer reasonably might have drawn from the information known to him.'") (citing *Young v. City of Chicago*, 987 F.3d 641, 644 (2021)).

The totality of the circumstances, even when viewed in a light most favorable to the Estate, show there was probable cause for law enforcement to effectuate a mental health seizure. Iler called the police, gave his address, and indicated he was "ready" and to bring the "tanks" and "armaments." (Doc. 80, p. 2). He then refused to answer when Officer Brown called him back. The call alone indicates he was possibly suicidal or a danger. Deputies were also aware of Iler's previous drug overdoses. (Doc. 73-1, p. 8). Although somewhat in dispute, Iler also appeared to make suicidal threats. (Doc. 78, p. 26). Deputy Morgan testified in his deposition that he learned from Reese of Iler's "suicidal tendency." (Doc. 78-3, p. 142). Iler also behaved erratically while officers were present, entering and exiting his home multiple times, swinging large knives around, banging them together and forcibly removing the railing off of his porch. (Doc. 80, p. 3).

Considering the totality of the circumstances, the Court finds that a reasonable officer would believe, at minimum, Iler posed a danger to himself, and a mental health seizure was justified. *See Bruce v. Guernsey*, 777 F.3d 872, 879 (7th Cir. 2015) ("Recall that for mental-health seizures, the question is whether there is probable cause to believe that the subject of the seizure is a danger to herself or others."); *see also id. at 876–77* (affirming dismissal of Fourth Amendment claim against officer who, based on dispatcher's report that plaintiff was possibly suicidal, detained her until another officer arrived); *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (affirming summary judgment for defendants; dispatcher told officers detainee was suicidal, detainee appeared intoxicated and admitted she was on antidepressants and going through a difficult period, but also told police at scene that she was not in fact suicidal); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997) (affirming summary judgment for defendants where man in hotel room gave unintelligible answers to police and was clenching ballpoint pens in both hands).

### 3.   Qualified Immunity

In the alternative, assuming that there was not probable cause for a pre-shooting seizure to occur, Defendants argue that they are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

When the constitutionality of an action depends on the existence of probable cause, an officer must have had "arguable probable cause" for qualified immunity to

attach. *Humphrey v. Staszak,* 148 F.3d 719, 725 (7th Cir. 1998). Arguable probable cause is "a relatively flexible standard." *Bruce v. Guernsey*, 777 F.3d 872, 879 (7th Cir. 2015). When determining whether arguable probable cause exists, the court must take into consideration the particular circumstances facing the officer. *Id*. For mental-health seizures, the question is whether there is probable cause to believe that the subject of the seizure is a danger to herself or others. *Id*. Whether arguable probable cause exists presents "a pure question of law" for courts to decide. *Cibulka v. City of Madison*, 992 F.3d 633, 639 n.2 (7th Cir. 2021).

The Estate argues that the facts construed in a light most favorable to it demonstrate that there was no arguable probable cause for a mental health seizure. (Doc. 80, p. 21). The Estate argues that there was no emergency, (Doc. 80, p. 30), and cites a Fourth Circuit case not directly on point, *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003). The holding in *Bailey*, however, is premised on officers observing nothing indicating that the person appeared to be suicidal or a danger to himself. *Id*. at 741. At heart, the Estate's arguments, and the cases cited, center on the alleged fact that Iler did nothing to demonstrate that he was danger to himself or others. (Doc. 80, pp. 30–31).

The Court disagrees. Even when all of the facts are construed in favor of the Estate, the Defendants had arguable probable cause to effectuate a mental health seizure. A reasonable officer would have found Iler posed an immediate threat to himself based on his words and actions. His call to Officer Brown and his subsequent actions justified a mental health seizure. Framed differently, even if there was not probable cause, it was

35

reasonable for the Defendants to have believed that probable cause existed in light of the circumstances and well-established law.

Accordingly, the Defendants are entitled to summary judgment on Count X.

C.  Count III: Fourth Amendment Conspiracy to Deprive Constitutional
Rights Claim Against Sheriff Kahl, Deputy Diveley, Deputy Bentley,
Deputy Morgan, and Officer Brown

Count III is a 42 U.S.C. § 1983 Fourth Amendment conspiracy to deprive constitutional rights claim against Sheriff Kahl, in his individual capacity, Deputies Diveley, Bentley, and Morgan, and Officer Brown. To establish conspiracy liability under § 1983, the plaintiff must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).

The Estate premises the conspiracy claim on the Defendants' decision to restrict Iler's freedom, arguing it was "an explicit agreement amongst *all* the defendants." (Doc. 81, p. 27) (emphasis in original). The Estate clarifies that the claim is "not premised on an access to court's theory, nor on the failure to prevent an unlawful shooting." (Doc. 80, p. 27). In other words, the conspiracy claim depends solely, according to the Estate, on the finding that Iler was illegally seized. (Doc. 80, p. 27).

For the reasons discussed in Count X, the Court finds as a matter of law that there was no violation of Iler's Fourth Amendment rights, as it pertains to a pre-shooting seizure, by Officer Brown, Deputy Bentley, Deputy Diveley, Deputy Morgan, and Sheriff Kahl. Therefore, Defendants cannot be held liable for federal conspiracy under § 1983

36

without the underlying substantive constitutional violation. *See Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("conclusion that the [plaintiffs] suffered no constitutional injury thus forecloses relief on the conspiracy claim").

Accordingly, summary judgment on Count III is proper.

### E. Count XI: Failure to Intervene Claim Against Sheriff Kahl, Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown

The Estate maintains that its failure to intervene claim is "not premised on . . . the failure to prevent the unlawful shooting." (Doc. 80, p. 27). The Estate instead premises the failure to intervene claim on the assertion that Iler was not free to leave before being shot. (Doc. 80, p. 27). Thus, Count XI fails for the same reason as Count X.

### F. Counts IV, V, and VI: State Law Wrongful Death Act Claim, State Law Negligence Claim and State Law Battery Claim Against Deputy Diveley

The Estate asserts three Illinois state law claims against Deputy Diveley: wrongful death, negligence, and battery, all premised on the undisputed fact that Deputy Diveley shot and killed Iler.

Deputy Diveley maintains that pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/4-102, he has blanket immunity for the Estate's state law claims. (Doc. 78, p. 38). "Section 4–102 of the Act immunizes local public entities and public employees for failure to: (1) establish a police department; (2) otherwise provide police protection; or, if police protection is provided, (3) failure to provide adequate police protection service." *Payne v. City of Chicago*, 384 Ill. Dec. 14, 16 N.E.3d 110, 118 (Ill. App. (1st Dist. 2014)) (citing 745 ILCS 10/4–102 (West 2004)). "Unlike § 2-202 of the Act, which applies when officers are

37

engaged in the 'execution or enforcement' of law, § 4-102 provides absolute immunity with no exception for willful and wanton conduct." *Turner v. City of Champaign*, 979 F.3d 563, 571 (7th Cir. 2020) (Comparing 745 ILCS 10/4-102 with 745 ILCS 10/2-202).

Thus, the critical question is whether Deputy Diveley was "providing police protection" or engaged in the "enforcement" of a law when he shot Iler. "Generally, the question of whether a police officer is executing and enforcing the law under section 2–202, rather than providing police protection or service under section 4–102, is a factual determination which must be made in light of the circumstances involved." *Payne*, 384 Ill. Dec. 14, 16 N.E.3d 110, 118 (Ill. App. 2014). "However, the question may be decided as a matter of law where the evidence is undisputed or susceptible to only one possible interpretation." *Id*. "Police efforts to aid, assist, or rescue individuals are within the scope of 'police protection or service' and are covered under section 4–102 of the Act." *Id*.

In *Payne*, the court noted that officers were not responding to a call that a crime was committed, were not investigating a crime, making an arrest, issuing a citation, or quelling a breach of the peace. *Id*. Instead, police were called to the home in response to a call for police assistance when a person called 9-1-1 to report that the plaintiff was high on drugs and destroying the house. *Id*. "The police were there not to enforce or execute any law, nor to provide any medical attention (as other personnel were dispatched and on the scene), but rather to provide police assistance to subdue plaintiff for plaintiff's own safety and the safety of his family members." *Id*. at 120–21. Accordingly, the court found that section 4-102 applied.

Similarly, in *Turner v. City of Champaign*, 979 F.3d 563, the Seventh Circuit, "follow[ing] the Illinois Appellate Court's decision" in *Payne*, affirmed summary judgment in favor of law enforcement officers, finding that the officers were protected by the Section 4-102 of the Illinois Tort Immunity Act. In *Turner*, police were called because a homeless man was acting erratically. *Id*. at 565. The man was speaking unintelligibly and was noncompliant with police. *Id*. After more questioning, police decided to detain him for his own protection. *Id*. at 566. The man resisted and died of cardiac arrythmia as police struggled to detain him. *Id*. The court held that the facts demonstrated that police were there to effectuate a mental health detention rather than a criminal arrest. *Id*. at 571. Thus, they were covered by Section 4-102 , barring the state law tort claims. *Id*. at 572.

The Estate argues that *Turner* is inapplicable and materially different from the present case. (Doc. 80, p. 26). The Estate argues that in *Turner*, unlike the present case, the officers called emergency medical services prior to the death, which the Estate claims evinced their intent to get medical help and not to effectuate an arrest. (Doc. 80, p. 26). Moreover, the Estate notes that Iler was in his home, while the decedent in *Turner* was a homeless man who was on the street at the time of the encounter with police. The Estate maintains the "stark difference" between the two is evident, in which Iler's case "started with a drunken phone call, and which progressed to [Iler] slowly walking to his driveway, while unarmed, before being shot." (Doc. 80, p. 26).

This presents a close call. Iler himself called the non-emergency police line and invited police to bring the tanks and armaments. After arriving on the scene, Deputies noted that Iler was agitated, acting erratically, and swinging knives. The Estate's

witnesses describe Iler as "acting like a fool." (Doc. 80, p. 26). Even in the initial aspects of their interaction, Deputies were not there to arrest Iler. Officer Brown testified they were there because Iler called them and they were not going to leave until they spoke with him. "We were going to try to find out what was going on as to why, what this phone call was in reference to, and what was going on as to why we were called." (Doc. 73-2, p. 37).

After careful review, the Court finds the evidence is susceptible to only one possible interpretation: Deputy Diveley and the other officers went to Iler's apartment to aid and assist Iler. The Estate's own arguments support this finding. For example, the Estate argues that no crime had been committed and "there was no arrestable offense at the time." (Doc. 80, pp. 11, 14). The Estate also maintains that if the Deputies were properly trained to recognize a mental health crisis, they would have contacted a local mental health facility and could have avoided Iler's death. (Doc. 81, p. 21). The Estate further notes that Deputies "did not go with lights or sirens to [Iler's] apartment" and that when they arrived at the apartment, Officer Brown and Deputy Diveley approached Iler's door with their weapons holstered. (Doc. 80, p. 12). The Deputies' knowledge of Iler's previous drug abuse, the fact he sounded intoxicated on his call to Officer Brown, and their learning of his purported suicidal tendencies are also illustrative. Again, Iler started the encounter by calling Officer Brown. The Estate simply does not present facts to call into question the stated reasons why the Defendants went to Iler's apartment.

Therefore, Deputy Diveley is entitled to immunity under section 4-102 for the state law claims. *See Payne*, 384 Ill. Dec. 14, 16 N.E.3d 110, 118 (Ill. App. 2014) (holding that

protective mental-health detentions, unlike criminal arrests, are covered by § 4-102's absolute immunity provision.); *Turner*, 979 F.3d at 572 (holding that because they were acting in a protective role, "officers' actions are therefore covered by § 4-102's blanket immunity, and no state-law claims may proceed against the officers. . .").

### G. Count VII: State Law Civil Conspiracy Claim Against Sheriff Kahl, Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown

The Estate's Illinois state law conspiracy claim is premised on an alleged "agreement to violate [Iler's] Fourth Amendment rights by making sure he could not leave," as well as "the placement of the knives on the porch, Brown's missing video, false and incomplete police reports (from the Plaintiff's perspective), and the communication amongst all the involved officers (Diveley, Morgan, Bentley, and Brown) from the night of the shooting until a week later." (Doc. 81, p. 29). The Court thus separates the Estate's allegations of an Illinois law conspiracy into two parts. The first part is very similar to the federal conspiracy claim and is based upon Iler allegedly being illegally seized before he was shot. The second alleged conspiracy asserts that there was an agreement to "cover up" the facts about the shooting.

The elements of an Illinois civil conspiracy claim are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004). Under Illinois law, civil conspiracy does not constitute a standalone claim. *Sonrai Systems, LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 612 (N.D. Ill.

41

2023) (citing *Adcock v. Brakegate Ltd.*, 206 Ill. Dec. 636, 645 (1994)). It instead "provides a mechanism for holding accountable members of a conspiracy for the unlawful action of other members." *Id*. Proof of civil conspiracy requires proof of an underlying tort. *Id*. "In order to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 241 Ill. Dec. 787, 803 (1999). Consequently, if the underlying tort action fails, then the claim for conspiracy also fails. *Indeck N. Am. Power Fund, L.P. v. Norweb, PLC*, 316 Ill. App. 3d 416, 432 (1st Dis. 2000).

### 1.　The Conspiracy to Violate Iler's Fourth Amendment Rights

The Estate argues that there is ample evidence for a jury to conclude that Iler's Fourth Amendment rights were violated when he was unlawfully seized. (Doc. 80, p. 34). The Court need not address this argument further. It fails for the same reason Count X fails.

### 2.　The Conspiracy to Cover Up

The third element of Illinois civil conspiracy requires an underlying tortious act. It is very unclear under Illinois law whether covering up a fellow officer's excessive use of force to include preparing false reports constitutes an independent tort, and, if so, what damages flow from it. Multiple federal district courts, however, have allowed similar claims to proceed. *See e.g., Estate of McIntosh by Lane v. City of Chicago*, 2022 WL 4448737 at * 9 (N.D. Ill. Sept. 23, 2022) (finding that it was a jury question whether officers conspired to cover up a shooting); *Pena v. Ortiz*, 521 F. Supp. 3d 747, 751 (N.D. Ill. 2021) (Illinois conspiracy claim based on allegation that officers conspired to prepare false

police reports and otherwise cover up fellow officer's use of excessive force survived motion to dismiss); *Murphy v. Smith*, 2014 WL 12683572, at *4 (S.D. Ill. Oct. 9, 2014) (declining to grant summary judgment on state law conspiracy claim and acknowledging that falsifying reports could be a tortious act under Illinois conspiracy law).

The cases seem to rely upon the Illinois Supreme Court's decision in *Fritz v. Johnston*, 209 Ill. 2d 302 (2004). In *Fritz*, the Illinois Supreme Court found that "[t]he allegation that Johnston did in fact file a false report with the State Police satisfies the third element, the actual commission of an overt unlawful act by one of the conspirators." *Id*. at 317. *See also Gomez* v. *Kruger*, 2019 WL 3321842 at *9 (N.D. Ill. July 24, 2019) (discussing Illinois conspiracy claim against police officers that combined malicious prosecution and cover up of use of force). Here, based upon *Fritz*, the Court finds that Illinois law does recognize a tort for covering up excessive force as least as far as it relates to filing false police reports.

As discussed above in relation to Count I, the excessive force claim against Deputy Diveley must be decided by a jury because there are competing factual narratives. One narrative is contained in police reports authored by the Defendants that, based on the above allegations, a jury could deem to be false and that the Defendants conspired with each other to make false. *See Gomez*, 2019 WL 3321842 at * 10 (explaining that with the merits of other claims pending, "adjudication of the conspiracy claim is best deferred until it can be addressed in tandem with plaintiffs' . . . excessive-force claim.")

Construing the facts in a light most favorable to the Estate, the Court finds that a reasonable jury could find that Deputies Diveley, Bentley, and Morgan, along with

Officer Brown, through their post shooting conduct, conspired to cover up the facts of the shooting to include filing false police reports.

### 3.    Immunity

Officer Brown and Deputies Diveley, Bentley, and Morgan argue that they are entitled to Section 4-102 immunity for the conspiracy claim. In response, the Estate argues that "conspiring to cover up an unlawful shooting (by destroying evidence, getting stories straight, etc.) bears no relationship to police services" and as a result argues that Section 4-102 does not immunize the Defendants for civil conspiracy. The Court agrees with the Estate.

As discussed previously, police efforts to aid, assist, or rescue individuals are within the scope of "police protection or service" and are covered under section 4–102. *See e.g. Anthony v. City of Chicago*, 382 Ill.App.3d 983, 994, 321 Ill. Dec. 202, 888 N.E.2d 721 (1st Dist. 2008) (providing rescue services or assistance is a function typically performed by the police that is covered by section 4–102). The Defendants, however, were not providing police protection services when they allegedly conspired with each other to cover up the facts about the shooting.

The Defendants are also not covered by Section 2-202 immunity, which "provides immunity only where the public employee is negligent while actually engaged in the execution or enforcement of a law." *Barnett v. Zion Park District*, 171 Ill. 2d 378, 391 (1996). "Section 4–102 immunity may apply in the context where police officers are simply 'providing [or failing to provide] police services,' but section 2–202 immunity requires more particular circumstances for its application, i.e., an act or a course of conduct 'in the

execution or enforcement' of law." *Aikens v. Morris*, 145 Ill.2d 273, 282 (1991). Section 2–202 does not necessarily include all activities of an employee during hours of duty but rather extends only to acts or omissions done while in actual execution or enforcement of a law. *Bruecks v. County of Lake*, 276 Ill. App. 3d 567, 568 (2nd Dist. 1995), appeal denied, 166 Ill. 2d 536 (1996). If the Defendants conspired to prepare false police reports, then they were not engaged in the execution or enforcement of a law and Section 2-202 does not apply.

Similarly, Defendants are not covered by the intracorporate conspiracy doctrine. (Doc. 78, pp. 44–45). The intracorporate conspiracy doctrine provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Illinois' articulation of the intracorporate conspiracy doctrine generally tracks the federal doctrine, providing that no conspiracy can exist "between a principal and agent because the acts of an agent are considered in law to be the acts of the principal." *Alpha Sch. Bus Co., Inc. v. Wagner*, 391 Ill. App. 3d 722, 738 (1st Dist. 2009). Illinois recognizes two exceptions to the intracorporate conspiracy doctrine: "(1) when a conspirator acts out of self-interest rather than in the principal's interest; or (2) when the scope of the act goes beyond the conspirator's official duties." *Bryant v. QuiBids LLC*, 2012 WL 394154, at *5 (N.D. Ill. Feb. 3, 2012).

The present case, taking the facts in a light most favorable to the Estate, falls into both of the exceptions. *See Pena v. Ortiz*, 521 F. Supp. 3d 747, 752–53 (N.D. Ill. 2021) (finding that the intracorporate conspiracy doctrine did not bar plaintiff's § 1983 and state

law conspiracy claims that officers conspired to falsify police reports about plaintiff's arrest).

Accordingly, Deputies Diveley, Bentley, and Morgan, along with Officer Brown are not entitled to summary judgment on the Estate's Illinois state law conspiracy claim.

### 4.  Sheriff Kahl

The Estate also names Sheriff Kahl in the conspiracy claim. As it relates to Sheriff Kahl, however, the Estate proffers no evidence that he participated in any of the alleged wrongdoing. The only allegation is that "[Sheriff] Kahl got in on the misbehavior" when he allegedly told Reese that they were going to use Jones to coax Iler out of his home. (Doc. 81, p. 26). This argument is speculative and also does not go to a cover up. *See Blumenshine v. Bloomington School District No. 87*, 2025 WL 2490599 at *4 (7th Cir. Aug. 29, 2025) (speculative and conclusory contentions alone are insufficient to move claims past summary judgment and may not be used to manufacture a genuine dispute of material fact.) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

Accordingly, summary judgment is granted as it relates to Sheriff Kahl on the Illinois state law conspiracy claim.

### H. Count VIII: State Law *Respondeat Superior* Claim Against Sheriff Kahl in his Official Capacity as Sheriff of Macoupin County

"Under Illinois law, county sheriffs are agents of the county sheriff's department, not the county." *Young Est. of Young v. Peoria Cnty., Illinois*, 2017 WL 3741551, at *3 (C.D. Ill. Aug. 30, 2017) (*citing Franklin v. Zaruba*, 150 F.3d 682, 685–86 (7th Cir. 1998)). Macoupin County, however, is a necessary party in any suit seeking damages from an

46

independently elected county officer in an official capacity. *Carver v. Sheriff of LaSalle Cty.*, 324 F.3d 947, 948 (7th Cir. 2003). This is because Illinois state law requires the county to pay for any judgment entered against the county sheriff in an official capacity. *Id.* (citing *Carver v. Sheriff of LaSalle Cty.*, 203 Ill.2d 497, 520 (2003)). Indemnification also applies to sheriff deputies acting in their official capacities.

No claims survive against Sheriff Kahl. Also, there is no *respondeat superior* liability under § 1983. Thus, the Sheriff in his official capacity only has potential *respondeat superior* liability as it relates to the Illinois conspiracy claim. The parties, however, have not briefed the issue, and the law is not clear. *See Squires v. Grundy County by and through the Grundy County Sheriff's Dept.*, 2025 WL 963958 at *6 (N.D. Ill March 31, 2025) ("based solely on the arguments and authority presented by the parties, the Court agrees with Defendants that Sheriff Briley cannot be held vicariously liable for Deputy Hawley's alleged battery."). Because it has not been adequately briefed, the Court will defer ruling.

### I. Count IX: State Law *Respondeat Superior* Claim Against Brighton

As Defendant Village of Brighton notes, Count IX's "fate is tied to Count VII." (Doc. 73, p. 3). Because the state law conspiracy claim against Officer Brown survives, the state law *respondeat superior* claim against the Village of Brighton also survives.

### V. CONCLUSION

Count I: Summary Judgment is DENIED.

Count II: Summary Judgment is GRANTED.

Count III: Summary Judgment is GRANTED.

Counts IV, V, VI: Summary Judgment is GRANTED.

Count VII: Summary Judgment is GRANTED in favor of Sheriff Kahl and DENIED as it relates to Deputy Diveley, Deputy Bentley, Deputy Morgan, and Officer Brown.

Count VIII: Ruling is deferred.

Count IX: Summary Judgment is DENIED.

Count X: Summary Judgment is GRANTED.

Count XI: Summary Judgment is GRANTED.

WHEREFORE, both the Village of Brighton Defendants' Motion for Summary Judgment, (Doc. 73), and the Macoupin County Defendants' Motion for Summary Judgment, (Doc. 78), are GRANTED in part and DENIED in part.

**ENTERED** this 14th day of November, 2025.

/s/ Douglas J. Quivey
DOUGLAS J. QUIVEY
UNITED STATES MAGISTRATE JUDGE